**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-2340

SUSAN B. DONNELL,

Plaintiff - Appellant,

versus

METROPOLITAN LIFE INSURANCE COMPANY, a New
York corporation,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.   James R. Spencer, District
Judge.  (CA-03-180-3)

Argued:  December 1, 2005          Decided:  February 8, 2006

Before MOTZ and DUNCAN, Circuit Judges, and James C. DEVER III,
United States District Judge for the Eastern District of North
Carolina, sitting by designation.

Affirmed by unpublished opinion.  Judge Duncan wrote the opinion,
in which Judge Motz and Judge Dever joined.

**ARGUED:** John Bertram Mann, LEVIT & MANN, P.C., Richmond, Virginia,
for Appellant.  Eric Wagner Schwartz, TROUTMAN SANDERS, L.L.P.,
Virginia Beach, Virginia, for Appellee. **ON BRIEF:**  John C. Lynch,
TROUTMAN SANDERS, L.L.P., Virginia Beach, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

DUNCAN, Circuit Judge:

Plaintiff-Appellant Susan Donnell appeals the district court's grant of summary judgment to Defendant-Appellee Metropolitan Life Insurance Company ("MetLife") on her action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) (2000), to recover long-term disability benefits in the amount of $552,922.56. For the reasons that follow, we affirm.

I.

Donnell worked as a bank credit analyst for Nations Bank until she left work in April 1995 due to the symptoms of fibromyalgia, chronic fatigue syndrome, vasodepressor syncope, and psychiatric disorders.[1] Soon after leaving her job, Donnell submitted a claim for long-term disability benefits to MetLife, the administrator of

---

[1]Fibromyalgia is "a common condition characterized by widespread pain in joints, muscles, tendons, and other soft tissues . . . [and by] fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety." U.S. Nat'l Library of Med., MedlinePlus: Fibromyalgia, at http://www.nlm.nih.gov/medlineplus/ency/article/000427.htm (Apr. 26, 2004). Chronic fatigue syndrome is "a condition of prolonged and severe tiredness or weariness . . . that is not relieved by rest and is not directly caused by other conditions." U.S. Nat'l Library of Med., MedlinePlus: Chronic Fatigue Syndrome, at http://www.nlm.nih.gov/medlineplus/ency/article/001244.htm (June 22, 2004). Vasodepressor syncope is the "temporary loss of consciousness and posture, described as 'fainting' or 'passing out.'" Am. Heart Ass'n, Syncope, at http://www.americanheart.org/presenter.jhtml?identifier=4749 (last visited Jan. 18, 2006).

- 2 -

the Nations Bank Long-Term Disability Benefits Plan ("Plan"). MetLife approved Donnell's claim on November 2, 1995.

MetLife opened a routine review of Donnell's file on September 24, 1997. In support of her claim, Donnell forwarded to MetLife medical records from her physicians. In 1998, she participated in a vocational assessment and a functional capacity evaluation conducted at MetLife's request.

On September 24, 1998, MetLife informed Donnell that it would terminate her benefits because it had determined that she did not qualify as disabled under the Plan. Donnell appealed the decision. MetLife then commissioned Dr. Moyer, a physician not affiliated with MetLife, to review the medical evidence in Donnell's file. Dr. Moyer concluded that Donnell's medical evidence did not establish that she was disabled from full-time sedentary work.

MetLife denied Donnell's appeal on April 16, 1999. Donnell submitted to MetLife additional medical records between April and August 1999, but the insurer informed Donnell that these new submissions did not alter its decision. In February 2001, Donnell sent MetLife additional medical evidence and documentation that she had been awarded Social Security Disability Insurance ("SSDI") four years earlier in March 1997. In February 2002, Donnell submitted to MetLife a functional capacity evaluation that had been conducted in October 2001. After each of these submissions, MetLife informed

Donnell that further review of her claim was not possible because her appeal had been closed since 1999.

Donnell filed suit under ERISA, 29 U.S.C. § 1132(a)(1)(B) (2000), seeking recovery of $552,922.56 in long-term disability benefits. The district court refused Donnell discovery to determine the extent of MetLife's conflict of interest in the adjudication of her claim and granted summary judgment in favor of MetLife. Donnell noted this timely appeal.

## II.

This court has developed a well-settled framework for reviewing the denial of benefits under ERISA plans. We review the district court's grant of summary judgment de novo, employing the same standards applied by the district court in reviewing the administrator's decision. Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 123 (4th Cir. 1994). Because the Plan gives the administrator discretion to determine eligibility for and entitlement to benefits, we review the administrator's decision for an abuse of that discretion, Bernstein v. CapitalCare, Inc., 70 F.3d 783, 787 (4th Cir. 1995), "based on the facts known to [the administrator] at the time." Sheppard & Enoch Pratt Hosp., 32 F.3d at 125. The administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if

it is supported by substantial evidence." Bernstein, 70 F.3d at 788 (internal quotation marks and citation omitted).

However, our standard of review is adjusted to accommodate the presence of a conflict of interest. In exercising its discretion, MetLife operated under such a conflict because it stood to benefit financially from a finding that Donnell was not disabled under the Plan's terms.[2] Because we must weigh this conflict when reviewing MetLife's termination of Donnell's benefits, we modify the abuse of discretion standard of review by lessening it "to the degree necessary to neutralize any untoward influence resulting from the conflict." Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993) (citation omitted); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Stup v. UNUM Life Ins. Co., 390 F.3d 301, 307 (4th Cir. 2004).

III.

We begin our review by determining the circumstances under which the Plan would entitle Donnell to benefits. The Plan pays a monthly cash stipend whenever an insured is "disabled"; claimants

---

[2]MetLife is compensated by a fixed premium from Nations Bank, from which it pays its claims. MetLife will therefore be the recipient of the savings resulting from a decision not to pay Donnell further benefits. See Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993) (noting that a conflict of interest exists when "one interpretation [of the plan] will further the financial interest of the [insurer]").

may so qualify under any one of the Plan's three definitions.[3]  New claimants may qualify for benefits under the first definition if they are unable to perform their regular job.  For those who, like Donnell, have already received twenty-four months of benefits, a second, more rigorous definition of "disabled" applies.  Such claimants must "be unable to perform each of the material duties of [their] regular job . . . [and of] any gainful work or service for which [they] are reasonably qualified taking into consideration [their] training, education, experience and past earnings."  J.A. 361.

---

[3]The Plan defines "disability" or "disabled" as follows:

[D]ue to an Injury or Sickness, you require the regular care and attendance of a Doctor (unless, in the opinion of a Doctor, future or continued treatment would be of no benefit) and:

1.  you are unable to perform each of the material duties of your regular job; and
2.  after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or
3.  you, while unable to perform all of the material duties of your regular job on a full-time basis, are:
    a.  performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and
    b.  earning currently at least 20% less per month than your Basic Monthly Earnings due to that same Injury or Sickness.

J.A. 361.

- 6 -

Donnell argues that the second definition of "disabled" entitles her to benefits if she is able to work on a part-time basis, but unable to work full-time.[4] She claims that the second definition's term "gainful work or service" means only full-time work or, in the alternative, that its meaning is ambiguous. While recognizing that ambiguities in ERISA plan language are construed in favor of beneficiaries, see Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 57 (4th Cir. 1995), we agree with the district court that the term "gainful work or service" does not exclude part-time work and that this meaning is plain from the Plan's text.

When determining the meaning of ERISA plan language, we are guided by the familiar axiom that contract terms should not be construed so as to render superfluous other provisions of the agreement. See, e.g., Tester v. Reliance Std. Life Ins. Co., 228 F.3d 372, 375 (4th Cir. 2000) (courts construing ERISA plan terms should refer to and apply basic principles of contract law). Donnell's contention that "gainful work or service" refers only to

---

[4]Although Donnell's primary argument asserts that she qualifies as "disabled" under the Plan's second definition, she claims in the alternative that her eligibility for benefits should be measured under the Plan's third definition of "disabled." We do not agree. A key element of the third definition requires claimants to be "performing at least one of the material duties of [their] regular job or any other gainful work or service on a part-time or full-time basis." J.A. 361. Under this definition, the Plan's clear language classifies as "disabled" only those who in fact are working in some capacity. Because Donnell was not working at any time relevant to her claim, this third definition of disability by its terms does not apply to her.

full-time work renders unnecessary a major portion of the Plan's third definition of "disabled." That definition provides benefits to narrow the gap between a claimant's pre-disability and post-disability earnings when she cannot perform her regular job on a full-time basis but is "performing at least one of the material duties of [her] regular job or any other gainful work or service on a part-time or full-time basis." J.A. 361. Under Donnell's interpretation of the second definition, the third definition's reference to part-time work is unnecessary. Any claimant unable to work full-time in a suitable job would qualify for disability benefits under the second definition, without regard to whether she was able to work part-time or in fact working part-time. We could adopt Donnell's interpretation and avoid finding this portion of the third definition superfluous only if we interpret it to define as "disabled" those claimants who are unable to perform their regular job full-time, who are capable of working full-time in another suitable position, and yet who choose to work only part-time. We will not distort the Plan's language to create such absurd results when the text is at least equally susceptible to the more reasonable conclusion that the term "gainful work or service" does not exclude part-time work. See F.D.I.C. v. Prince George Corp., 58 F.3d 1041, 1046 (4th Cir. 1995) ("[W]here one construction [of a contract term] makes the provisions unusual or extraordinary and another construction [that] is equally consistent

with the language employed, would make it reasonable, fair and just, the latter construction must prevail." (citation omitted)).

Furthermore, Donnell's version of the Plan's second definition of "disabled" requires us to ascribe two mutually exclusive meanings to the term "gainful work or service." A key factor in the Plan's third definition of "disabled" focuses on whether the claimant is "performing at least one of the material duties of [her] regular job or <u>any other gainful work or service</u> on a <u>part-time</u> or full-time basis." J.A. 361 (emphasis added). The use of "gainful work or service" in this context demonstrates that the term, as used in the third definition, encompasses all work performed for income, without regard to whether it is performed full- or part-time. We will not assign a different meaning to the second definition's use of the same term.

For the reasons outlined above, we conclude that the Plan's second definition of "disabled" applies only to claimants who are unable to perform any full-time or part-time work for which they are reasonably qualified based on their training, education, experience, and past earnings. Donnell's claim for benefits must demonstrate that she meets these criteria.

IV.

We turn now to our review of MetLife's determination that Donnell was not disabled under the Plan's second definition, which

- 9 -

requires in relevant part that a claimant be "unable to perform each of the material duties of any gainful work or service for which [she is] reasonably qualified taking into consideration [her] training, education, experience and past earnings."[5] J.A. 361. To survive abuse of discretion review, MetLife's termination of Donnell's benefits must have been reasonable. See Stup, 390 F.3d at 307. A reasonable decision is "the result of a deliberate, principled reasoning process" and is "supported by substantial evidence."[6] See id. (citations omitted). As we have noted,

---

[5]The second definition also requires claimants to be "unable to perform each of the material duties of [their] regular job," J.A. 361, but the parties on appeal have focused their arguments on whether Donnell satisfies the second definition's companion requirement that she be unable to perform any job for which she is reasonably qualified.

[6]This court has alternatively framed reasonableness as an open-ended inquiry that may, in addition to other relevant issues, consider the following eight factors: "(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have." Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000). We have never explicitly overruled Booth's facially more expansive test of reasonableness. Recent decisions have embraced both standards. Compare Stup, 390 F.3d at 307 (defining reasonable decisions as those that are "the result of a deliberate, principled reasoning process" and that are "supported by substantial evidence" (citations omitted)), with McCoy v. Holland, 364 F.3d 166, 170 (4th Cir. 2004) (holding that courts "may consider many factors in determining the reasonableness of a fiduciary's discretionary

- 10 -

judicial review of the reasonableness of MetLife's decision is limited to the body of evidence before the administrator at the time it rejected Donnell's claim.  <u>See, e.g.</u>, <u>Elliot v. Sara Lee Corp.</u>, 190 F.3d 601, 608-09 (4th Cir. 1999).

## A.

MetLife's decision to terminate Donnell's disability benefits resulted from a process that was deliberate and principled.  The company's decisionmaking process included a genuine and thorough consideration of all the evidence before it.  It reviewed all medical evidence that Donnell submitted, measured Donnell's vocational abilities, procured an independent evaluation of the medical evidence,[7] and considered all of the conditions that Donnell claimed contributed to her disability.  Furthermore, MetLife kept Donnell informed of the status of her claim throughout the review, notifying her of its decision on initial review to terminate her benefits, of its decision on appeal to uphold the

---

decision" (citing <u>Booth</u>, 201 F.3d at 342-43)).  We reconcile the two lines of cases by viewing the <u>Booth</u> factors as more particularized statements of the elements that constitute a "deliberate, principled reasoning process" and "substantial evidence" and of the reasons for applying a modified abuse of discretion standard of review.

[7]Donnell claims that Dr. Moyer's evaluation of her medical evidence was biased due to his affiliation with a firm that markets its medical review services to disability insurers, but she has pointed to no evidence suggesting that this affiliation unduly influenced either Dr. Moyer's or MetLife's review of the medical evidence.

termination, of its decisions not to reverse its denial of her appeal in light of additional evidence that she submitted in 1999, and of its refusals to re-open her appeal in 2001 and 2002.

These procedures comport with those we have previously found to be deliberate and principled.  See, e.g., Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 344-45 (4th Cir. 2000) (decision based on "numerous" evaluations by independent doctors and claimant-submitted evidence was the result of a principled and reasonable process); Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 233-34 (4th Cir. 1997) (decision based on independent and claimant-submitted medical evidence and resulting from a "lengthy and thorough" evaluation was the product of a deliberate, principled reasoning process).  Likewise, these procedures do not suffer from the infirmities that we have identified as fatal on abuse of discretion review.  See, e.g., Johannssen v. Dist. No. 1 — Pac. Coast Dist. MEBA Pension Plan, 292 F.3d 159, 177-78 (4th Cir. 2002) (benefits decision based on interpretations of plan terms that render text superfluous, or disregard plain meaning was not the product of a deliberate or principled decisionmaking process).

Having concluded that MetLife's decision was the result of a deliberate and principled decisionmaking process, we now proceed to consider whether that decision was supported by substantial evidence.

B.

Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that "a reasoning mind would accept as sufficient to support a particular conclusion." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984), overruled by implication on other grounds by Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003); see also United Seniors Ass'n v. Social Sec. Admin., 423 F.3d 397, 404 (4th Cir. 2005).

Substantial evidence supports MetLife's conclusion that Donnell's vasodepressor syncope was not disabling under the Plan's terms. In 1997, one of Donnell's treating physicians for the syndrome opined that the syncope, by itself, would not prevent her from sitting for eight hours or walking one mile. In 1999, another of Donnell's treating physicians for the syncope noted that Donnell's condition had stabilized and would not prevent her from working. Dr. Moyer, the independent physician retained by MetLife to review Donnell's file, agreed that the vasodepressor syncope was not disabling.

Substantial evidence likewise supports MetLife's finding that Donnell's fibromyalgia and chronic fatigue syndrome were not disabling under the Plan's second definition.[8] The 1998 functional

---

[8]We do not consider the findings of the 2001 functional capacity evaluation or Donnell's award of SSDI benefits because that evidence was not before MetLife when it rendered its decision.

- 13 -

capacity evaluation concluded that Donnell could perform up to five hours per day of light work or six hours per day of sedentary work. MetLife also identified four job categories that were suitable to Donnell's professional skills, earnings history, and physical abilities.[9]

In light of the above, MetLife was not unreasonable in finding that Donnell was not "unable to perform each of the material duties of any gainful work or service for which [she is] reasonably qualified taking into consideration [her] training, education, experience and past earnings." J.A. 361. We therefore find that MetLife did not abuse its discretion when it terminated Donnell's long-term disability benefits.

---

As we have noted, MetLife's decision must stand or fall based on the evidence that was before it at the time. See, e.g., Elliot, 190 F.3d at 608-09.

[9]No evidence in the record suggests that the occupations that MetLife identified were unsuitable for Donnell because she is able to work only six hours per day. Donnell has the burden to prove that she is entitled to receive disability benefits under the Plan. See Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir. 2005) (ERISA plaintiffs must prove that their insurance contract entitles them to benefits); Band v. Paul Revere Life Ins. Co., 14 Fed. Appx. 210, 212 (4th Cir. 2001) (per curiam) (unpublished) (ERISA plaintiffs must prove that they are entitled to benefits under their insurance plan); cf. Gable v. Sweetheart Cup Co., 35 F.3d 851, 855 (4th Cir. 1994) (ERISA plaintiffs have the burden to prove that their plan promised to provide vested benefits). Because Donnell failed to offer evidence that the identified occupations were unsuitable for part-time workers, MetLife did not act unreasonably in relying upon its vocational assessment to conclude that Donnell was not disabled from those occupations.

V.

Donnell also charges that MetLife violated procedural regulations governing benefits claims under ERISA plans and that these violations constituted an abuse of discretion. She claims that MetLife's initial termination letter violated 29 C.F.R. § 2560.503-1 by failing to outline the evidence necessary to perfect her appeal or to inform her of her right to review the administrative record. She claims that MetLife further violated Section 2560.503-1 by deciding her appeal outside the regulation's 120-day timeline.

None of these arguments persuades us to find that MetLife abused its discretion in terminating Donnell's benefits. First, as we have previously held in the very case that Donnell cites to support her arguments, Section 2560.503-1 does not direct ERISA plan administrators to provide claimants with a formula for obtaining benefits. Ellis, 126 F.3d at 235-36. Second, MetLife's initial denial letter[10] substantially complied with Section 2560.503-1's requirement that such letters outline the steps that

_____

[10]MetLife's initial denial letter of September 24, 1998, states in relevant part: "You may file a written request for review of your claim within 60 days of receipt of this letter. This request should be directed [to MetLife at a given address]. When requesting this review, you should state the reason you believe the claim was improperly denied and submit any additional medical information or facts, data, questions or comments which you deem appropriate and important for us to give your appeal proper consideration. Metropolitan Life will re-evaluate all the data and you will be informed in a timely manner of our decision." J.A. 891.

a claimant must take to obtain review. See 29 C.F.R. § 2560.503-1(g)(1)(iv) (2005); Ellis, 126 F.3d at 235 & n.5 (holding that language nearly identical to that in MetLife's initial denial letter to Donnell satisfied the regulation's requirements). Finally, Donnell is correct that MetLife's initial denial letter does not comply with this circuit's interpretation of Section 2560.503-1 to require that initial denial letters advise claimants of their right to review the evidence upon which the denial of benefits was based. See Ellis, 126 F.3d at 237. She is also correct that MetLife took more than the 120 days that Section 2560.503-1 allows to decide her appeal. See 29 C.F.R. § 2560.503-1(i)(1)(I) (2005). However, we have made clear that we will not find an abuse of discretion based on ERISA procedural violations absent "a causal connection between [procedural defects] and the final denial of a claim." Ellis, 126 F.3d at 238. Donnell has asserted no such link between MetLife's noncompliance with Section 2560.503-1 and the denial of her claim, and we accordingly do not disturb our finding that MetLife did not abuse its discretion.

VI.

Finally, Donnell argues that the district court erred in refusing to allow her to conduct discovery to determine the extent to which MetLife's conflict of interest impacted its decision. We cannot agree.

First, our precedent has established modification of the abuse of discretion standard of review as the method by which courts may take account of any conflict of interest that may have tainted the administrator's decision. See, e.g., Stup, 390 F.3d at 307; Bernstein, 70 F.3d at 788; Doe, 3 F.3d at 87; see also Firestone, 489 U.S. at 115. We concur with the district court's assessment that MetLife's decision would survive judicial review even under the least deferential version of our modified abuse of discretion standard of review. As we have explained, Donnell has shown no deficiencies, in either MetLife's decisionmaking process or the evidence supporting its actions, that might make us reluctant to uphold the company's decision under a less deferential abuse of discretion standard of review. Thus, even assuming that discovery would uncover a bias that would warrant modifying our abuse of discretion standard of review to the fullest extent that our jurisprudence allows, such evidence would not affect our conclusion that MetLife's decision was reasonable. We therefore see no error in refusing Donnell the opportunity to conduct discovery on an issue that is irrelevant to the ultimate outcome of her claim.

Second, even in ERISA actions in which courts review the administrator's decision de novo, introduction of evidence outside the administrative record is permitted only in exceptional circumstances. Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1026-27 (4th Cir. 1993). Where, as here, a court reviews an

administrator's decision under a deferential standard, discovery and introduction of extrinsic evidence pertaining to the "mental processes of the plan's administrator" are generally, if not uniformly, disallowed. See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan, 195 F.3d 975, 981-82 (7th Cir. 1999). Donnell has presented no reason to warrant our deviation from these principles.

## VII.

Because MetLife's decision was reasonable, we find that it did not abuse its discretion when it terminated Donnell's long-term disability benefits. Accordingly, the judgment of the district court is

AFFIRMED.